UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
JOSE GARCIA,

                            Plaintiff,

              -against-

KHEMRAJ BASDEO et al.,

                        Defendants.
-------------------------------------------------------------x

MEMORANDUM
AND ORDER

04-CV-4129 (RLM)

ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:

       Plaintiff Jose Garcia ("plaintiff" or "Mr. Garcia") brought a negligence action in Kings

County Supreme Court against Khemraj Basdeo, s/h/a Rhemrat Basdeo ("Mr. Basdeo"), and

Mr. Basdeo's wife, Suseema Basdeo ("Mrs. Basdeo") (collectively "defendants"), to recover

damages for injuries sustained when Mrs. Basdeo's car collided with the parked car in which

plaintiff was seated.[1]  The defendants removed the action to this Court, pursuant to 28 U.S.C.

§ 1441.  Neither party requested a jury trial, and both parties consented to trial before a

magistrate judge.  See 28 U.S.C. § 636(c)(1).  At the conclusion of a two-day bench trial, this

Court directed the parties to submit proposed findings of fact and conclusions of law, which

were filed on July 22, 2005.

       For the reasons set forth below, this Court finds that defendants were negligent; that

plaintiff was comparatively negligent; that plaintiff sustained pecuniary damages in the amount

---

[1] Although Mr. Basdeo was driving his wife's car at the time of the accident, and Mr. Garcia was driving his girlfriend's car (see Trial Transcript ["Tr."] at 19), for the sake of simplicity, the vehicles hereinafter will be referred to as "defendant's vehicle" and "plaintiff's vehicle," respectively.  The collision between the two cars will be referred to as the "accident" or the "collision."

of $36,376.82 in excess of his basic economic loss, and $175,000 in damages for past pain and suffering; the Court reduces those sums by 25 percent to account for plaintiff's comparative fault, resulting in a total award of $158,532.62.

## FINDINGS OF FACT

I. The Accident

On August 1, 2002, defendant's vehicle collided with plaintiff's vehicle in front of the Bamboo Garden Restaurant ("Bamboo Garden") on Atlantic Avenue in Queens County, New York. See Tr. at 18-19, 50. Although there is conflicting testimony regarding the precise time of the accident, it is undisputed that it occurred sometime in the evening. See Tr. at 51, 68-69, 79; Plaintiff's Exhibit ("Pl. Ex.") 1.

The paved parking area directly in front of the Bamboo Garden contains four or five parking spaces, which run perpendicular to the restaurant and are recessed from the street. See Tr. at 51-52; Defendants' Exhibit ("Def. Ex.") G-3, G-4. On the date of the accident, Mr. Basdeo parked his wife's car, a 1992 Acura Legend, in one of the two spaces to the left of the front door to the restaurant. See Tr. at 91-92. Mrs. Basdeo remained in the car with her mother-in-law and two sons, while Mr. Basdeo went inside the restaurant for take-out food. See id. at 52-54. Mrs. Basdeo was seated between her two sons in the backseat of the car. See id. at 54, 90. She left the car briefly to take one son to the restroom but returned before her husband did. See id. at 53, 81-82.

Mr. Garcia and his fiancée/girlfriend, Panchoalla ("Pam") Singh, also drove to the Bamboo Garden for take-out food. See id. at 19; see also id. at 14. Mr. Garcia parked Ms. Singh's white Dodge Premium on Atlantic Avenue, "in the middle of the driveway" in front of

the restaurant.  <u>Id.</u> at 20.  He parked the car parallel to the street, with the restaurant (and parked cars) to his right.  <u>See id.</u> at 19, 20, 103.  Mr. Garcia remained seated in the driver's seat of the car while Ms. Singh went inside to retrieve the food.  <u>See id.</u> at 20-21.

Mr. Basdeo acknowledged at trial that he did not notice plaintiff's vehicle parked on Atlantic Avenue when he entered the restaurant, nor did he notice it 45 minutes later when he returned to his vehicle and started to back it up.  <u>See id.</u> at 54-55.  Mrs. Basdeo saw the Dodge when she looked over her shoulder, but did not have time to warn her husband before the collision occurred.  <u>See id.</u> at 90.  Mr. Basdeo realized there was a vehicle behind him only after he felt a "bump" and stopped his car.  <u>See id.</u> at 55-56.

Immediately before the accident, Mr. Garcia was seated in the driver's seat of the Dodge looking across the street to his left, away from the restaurant, with his right arm between his body and the armrest separating the two front seats.  <u>See id.</u> at 22, 43-44.  Mr. Garcia heard a car door slam and turned toward the restaurant on his right.  <u>See id.</u> at 22.  The car shook as he was turning and, within seconds, he saw a car "on top of" his car.  <u>See id.</u> at 22-24.  Mr. Garcia's testimony is confusing as to which part, or parts, of his body came into contact with the armrest during this time.  <u>See id.</u> at 24, 48, 104.  At his deposition, Mr. Garcia testified that his right shoulder and right elbow came in contact with the armrest.  <u>See id.</u> at 104-05.[2]  However, at trial, Mr. Garcia testified that only his elbow hit the armrest as he turned to the right.  <u>See id.</u> at 24; <u>see also id.</u> at 48 ("The shoulder -- when I twist like that, that's when everything happened, you know, the jam.  Everything happened like in one

_____

[2]  Portions of Mr. Garcia's deposition testimony were read into the record at trial.  <u>See</u> Tr. at 102-06.

3

shot.").

It is undisputed that the rear driver's side corner of defendant's vehicle hit the middle passenger side of plaintiff's vehicle.  See id. at 25, 55-57.  Mr. Basdeo backed up his vehicle between three and six feet before hitting plaintiff's vehicle.  See id. at 55, 66; see also Def. Ex. C, D.  Mr. Basdeo was driving "very slow[ly]" when the impact occurred.  See Tr. at 55-56. Plaintiff's vehicle was dented on the front passenger side, see id. at 57, 106, and the paint was scratched off of the corner of the driver's side rear bumper of defendant's vehicle.  See id. at 57; Def. Ex. A, D, E, F.

## II. Plaintiff's Injuries

As soon as the collision occurred Mr. Garcia "felt something," but he initially assumed that any injury was minor.  See Tr. at 26.  According to his testimony, he did not report an injury to the police officers who arrived on the scene because he was "in shock."  See id.  It is unclear whether Mr. Garcia or Ms. Singh drove plaintiff's car from the Bamboo Garden after the accident.  See id. at 218.

Mr. Garcia began to feel pain in his right shoulder, head and leg after returning to Ms. Singh's home on August 1, 2002.  See id. at 27.  The pain increased through the night and into the following day.  See id.  Mr. Garcia did not report to work the next day and was taken to Brookdale Hospital by ambulance.  See id. at 27-28; Pl. Ex. 2-3.  In the emergency room, Mr. Garcia complained of pain to his neck, shoulder, and back.  See Pl. Ex. 4.  He was given Ibuprofen and a muscle relaxant for the pain.  See Tr. at 28; Pl. Ex. 4.

On August 3, 2002, Mr. Garcia came under the care of a chiropractor, Dr. Anthony S. DeSano.  See Tr. at 29; Pl. Ex. 6.  Dr. DeSano began treating Mr. Garcia with chiropractic

treatment, physical therapy, and acupuncture. <u>See</u> Tr. at 30; Pl. Ex. 6. He also sent Mr. Garcia for a neurological examination and for magnetic resonance imaging ("MRI") of his right shoulder, cervical spine, and lumbar spine. <u>See</u> Tr. at 30; Pl. Ex. 10, 12-17.[3]

Three or four weeks after the accident, Dr. DeSano referred Mr. Garcia to an orthopedic surgeon, <u>see</u> Tr. at 31, and Mr Garcia began treatment with Dr. Dante Trovato on September 9, 2002. <u>See</u> Tr. at 119; Pl. Ex. 18. After reviewing the MRI results and conducting a physical exam, Dr. Trovato determined that Mr. Garcia had a right rotator cuff tear. <u>See</u> Tr. at 121-22; Pl. Ex. 18.[4] At that time, Dr. Trovato recommended continued physical therapy and gave Mr. Garcia cortisone injections and other pain medication. <u>See</u> Tr. at 122-23; Pl. Ex. 18.

The therapy treatments were not alleviating the pain in Mr. Garcia's neck or shoulder. <u>See</u> Tr. at 32. When Mr. Garcia's shoulder condition failed to improve over the course of treatment, Dr. Trovato recommended surgery. <u>See id.</u> at 124-31.[5] On March 27, 2003, Mr.

---

[3] Mr. Garcia's testimony that Dr. DeSano also requested an MRI of his leg (<u>see</u> Tr. at 30) is not supported by the medical evidence, nor is there any proof that Mr. Garcia sustained injury to his leg in connection with the accident. In fact, plaintiff's post-trial submission simply states that "[a]s a result of this accident, Plaintiff sustained a tear of the right rotator cuff in addition to injuries to his cervical spine and lumbar spine." [Plaintiff's] Post-Trial Memorandum of Law ("Pl. Mem.") at 2.

[4] Although Dr. Trovato's notes from November 11, 2002 include a diagnosis of right rotator cuff tendinitis, his notes from September 9, 2002, as well as from December 9, 2002, January 4th and 27th and February 12, 2003, all state that plaintiff suffered from a torn rotator cuff. <u>See</u> Tr. at 121-22,166; Pl. Ex. 18. Dr. Trovato testified that he had no doubt that plaintiff had in fact sustained a rotator cuff tear (<u>see</u> Tr. at 166), and defendants have not challenged that diagnosis.

[5] As Dr. Trovato was not treating Mr. Garcia's neck pain, his opinions at trial related solely
(continued...)

Garcia underwent open surgery of his right shoulder at Flushing Hospital.  See Tr. at 33, 132; Pl. Ex. 24.  Following the surgery, Mr. Garcia's right shoulder was immobilized with a bandage and a sling.  See Tr. at 35-36, 133.  The bandage was removed after about a week, but Mr. Garcia's arm remained in the sling for three months.  See id. at 36.

Mr. Garcia was able to resume physical therapy on May 7, 2003.  See Pl. Ex. 18.  On October 4, 2003, Dr. Trovato concluded that Mr. Garcia had reached maximum medical improvement and had regained nearly full range of motion in his right shoulder.  See Tr. at 139, 143.  Dr. Trovato advised Mr. Garcia to continue doing exercises for his arm on his own and told him he could return to work at that time.  See id. at 37-38, 139, 143.

III.  Plaintiff's Employment

Mr. Garcia was unable to work from the date of the accident, August 1, 2002, until October 4, 2003.  See id. at 37-38, 140.  Before the accident, he worked as a butcher at a Food Emporium in Manhattan where, during the year preceding the accident, he earned $52,315.62 inclusive of regular wages and overtime.  See Tr. at 16-17; Pl. Ex. 29; see also Pl. Mem. at 13.  Mr. Garcia testified at trial that after the accident he was reimbursed for some portion of his lost wages, but he could not specify whether he received $800 or $1,000 and was unclear as to how often these payments were made.  See Tr. at 44-45.  Mr. Garcia did not return to this position in October 2003, but instead moved to Florida, where he began working as a butcher at a Publix Supermarket earning $14 per hour, first on a part-time basis and later full time.  See id. at 15-16.

---

[5](…continued)
to plaintiff's shoulder.  See Tr. at 149.

Before the accident, Mr. Garcia had volunteered as an auxiliary police officer and was assigned to community patrol for school dismissal with the 77th precinct. See id. at 18. After the accident, plaintiff was unable to continue this volunteer work. See id.

## CONCLUSIONS OF LAW

I.  Liability

Plaintiff contends that the accident was caused solely by Mr. Basdeo's negligence. See Pl. Mem. at 1. Defendants do not dispute liability (see generally Defendant Khemra[j] Basdeo and Suseema Basdeo's Proposed Findings of Fact and Conclusions of Law ["Def. Mem."]), but argue that plaintiff was comparatively negligent and that any damages should be reduced accordingly. Id. at 4. The parties correctly assume that New York law applies to this action. See generally Pl. Mem.; Def. Mem.

A.      Mr. Basdeo's Negligence

In operating a motor vehicle, a driver has the duty to exercise due care. See Pittman v. Rickard, 743 N.Y.S.2d 795, 796 (4th Dep't 2002) (to establish liability in a negligence action, plaintiff must prove, among other things, that defendant's conduct fell well below "any permissible standard of due care."); Simmons v. Weegar, 739 N.Y.S.2d 801 (4th Dep't 2002). "Due care is that care which is exercised by reasonably prudent drivers." Russell v. Adduci, 528 N.Y.S.2d 232, 234 (3d Dep't 1988). The undisputed evidence at trial indicates that plaintiff's vehicle was parked parallel to the Bamboo Restaurant for some time prior to the accident, and that it was clearly visible from the parking spaces directly in front of the restaurant. See Tr. at 21-22, 25. It is also uncontested that Mr. Basdeo's view behind him was unobstructed, and that he should have been able to see plaintiff's vehicle through his rear

window.  See id. at 25, 83-84.  Accordingly, this Court finds that Mr. Basdeo did not exercise due care when backing out of the parking space.

      B.      Plaintiff's Comparative Negligence

As set forth above, plaintiff testified at trial that the parking spots in front of the Bamboo Garden were occupied when he arrived at the restaurant with Ms. Singh.  See id. at 20.  Consequently, he parked "in front of the driveway."  Id.  When asked by his attorney to describe the driveway, plaintiff said "[i]t's a big driveway, maybe five, six cars fit there, maybe, or maybe four.  I parked right in the middle of the driveway."  Id.  This testimony is consistent with plaintiff's statements during his deposition.  See id. at 102, 103.

In their post-trial submissions, both parties focus on whether or not plaintiff violated the New York City traffic regulation that prohibits cars from parking or stopping in front of a public or private driveway.  See 34 RCNY § 4-08(f)(2); Pl. Mem. at 6-7; Def. Mem. at 4. However, the Court need not resolve this issue, as a violation of this regulation would not be dispositive of comparative negligence, but would only constitute some evidence that plaintiff was negligent.  See Elliott v. City of New York, 95 N.Y.2d 730, 734 (N.Y. 2001); Travelers Indemnity Co. v. 28 East 70th St. Constr. Co., 296 F.Supp.2d 476, 487-88 (S.D.N.Y. 2003) ("It is well established under New York law that a violation of a City ordinance does not constitute negligence per se, and although it may be some evidence of negligence, the [party claiming negligence] must still show that the violation was a 'substantial factor' or proximate cause of the injury at issue.").  Moreover, it is well settled that a plaintiff may be comparatively negligent without violating a specific law or regulation.  See, e.g., Thoma v. Ronai, 592 N.Y.S.2d 333, 333-34 (1st Dep't 1993) (affirming denial of plaintiff's motion for

summary judgment, on the ground that court could not rule out comparative negligence as a matter of law simply because plaintiff was lawfully in a crosswalk when defendant's vehicle struck her, as a pedestrian has a duty to look carefully before crossing); <u>Beattie v. Bolla Taxi, Inc.</u>, No. 01 Civ. 1270(SWK), 2003 WL 22070538, at *1 (S.D.N.Y. Sept. 5, 2003) ("pursuant to the doctrine of comparative negligence, a driver who proceeds in the face of a green light may be found partially responsible for the ensuing accident if he does not use reasonable care in approaching the intersection.").

Accordingly, regardless of whether or not plaintiff violated 34 RCNY § 4-08(f)(2), plaintiff did not exercise due care in parking in the middle of an active driveway, and plaintiff's negligence was a proximate cause of the collision and his resulting injuries. <u>See Kane v. United States</u>, 189 F.Supp.2d 40, 52 (S.D.N.Y. 2002) ("A plaintiff must exercise the reasonable care that a reasonably prudent person would use under similar circumstances to protect [him]self from injury."). Mr. Garcia parked his car across the driveway, knowingly blocking cars that were parked in spaces in front of the restaurant and thereby preventing them from leaving the premises and entering the roadway.[6] Furthermore, by his own admission, plaintiff was not paying sufficient attention to the movement of the cars in the parking spaces, and, immediately before the accident, he was looking in the opposite direction, across the street. <u>See</u> Tr. at 22.

This Court concludes that Mr. Garcia was comparatively negligent and 25 percent

---

[6] Mr. Garcia testified at trial that while waiting for Ms. Singh to return to the vehicle, he asked a woman exiting the restaurant whether she was leaving and needed him to move his car. <u>See</u> Tr. at 21-22.

responsible for the accident, while defendants were 75 percent responsible.

II.    Causation

The Court further finds that, despite the minimal damage to the parties' cars, and the statistical improbability of a resulting serious injury, the collision did in fact cause plaintiff's rotator cuff to tear.  Although plaintiff's testimony alone does not dictate such a finding,[7] the Court is persuaded, based on the totality of the evidence, including medical testimony (see id. at 142), that the accident was the proximate cause of plaintiff's rotator cuff injury.[8]  Plaintiff credibly testified that he "felt something right away," and that he began experiencing pain in his shoulder a few hours after the collision.  See id. at 26-27.  According to the uncontradicted medical opinion of Dr. Trovato, this delay in pain is consistent with a rotator cuff tear, which

---

[7]  As noted above, plaintiff's testimony regarding the impact to his shoulder at the time of the accident is somewhat confused.  It appears from plaintiff's testimony that he was in the process of twisting his body around to the right at the time of the accident, and that this twisting motion, combined with the impact to the car, somehow caused his shoulder to jam.  See Tr. at 22-24, 43-48, 104.  Dr. Trovato testified that an accident such as the one at issue in this case may cause a rotator cuff tear if the victim contracted his muscles before the collision and then sustained a direct blow to his shoulder. See id. at 141-42, 157-58.  Indeed, he testified that a direct blow to the rotator cuff alone would be enough to tear the tendon.  See id. at 158-61.

[8]  In addition to a torn rotator cuff, plaintiff complains that he suffered back and neck injuries.  It is unclear what specific injuries plaintiff claims he sustained, as he describes them solely as "injuries to his cervical spine and lumbar spine."  Pl. Mem. at 2.  Plaintiff did not call an expert to testify on this issue and the evidence introduced at trial indicates that, at most, plaintiff suffered from minor neck and back injuries.  Plaintiff did complain of pain after the accident (see, e.g., Tr. at 32; Pl. Ex. 2, 4, 10, 20), but an examination of his cervical spine conducted two days after the collision revealed that plaintiff suffered from degenerative disc disease.  See Pl. Ex. 6.  Moreover, although an orthopedic evaluation conducted on October 10, 2002 indicated that plaintiff had active cervical and lumbar sprains, a follow-up examination on February 1, 2003 revealed that those sprains had been resolved.  See Pl. Ex. 26. Accordingly, this Court finds that while the accident may have caused minor sprains in plaintiff's back and neck, those injuries were not significant or long-lasting.

10

on occasion will not begin to cause pain until as long as several hours later, once the swelling starts. See id. at 140-41, 161-62, 167; see also id. at 181. Plaintiff called an ambulance the following day because the pain in his shoulder was getting worse. See id. at 27; Pl. Ex. 2.

Plaintiff thus has adduced sufficient credible evidence to support his position that the accident caused his rotator cuff to tear, particularly in the absence of proof of any alternative cause of that injury. Compare Alcalay v. Town of North Hempstead, 690 N.Y.S.2d 739, 741 (2d Dep't 1999) (plaintiff failed to prove that the accident with defendant's van caused her injuries where there was evidence of both a pre-existing medical condition and of plaintiff's involvement in two other accidents before the dates of her medical examinations); Glozik v. Nat'l Freight, Inc., 567 N.Y.S.2d 562, 563-64 (3d Dep't 1991) (jury reasonably concluded that plaintiff did not establish that defendant proximately caused her injuries, where proof of two prior accidents was introduced at trial). It is undisputed that plaintiff worked as a butcher until the day of the accident without experiencing any right shoulder difficulties. See Tr. at 39; Pl. Ex. 29. Moreover, Dr. Trovato did not see any signs of a chronic injury when he performed plaintiff's open shoulder surgery (see Tr. at 166), and defendants' medical expert agreed that the most reliable way to assess the nature and extent of a rotator cuff tear is to examine the shoulder during surgery. See id. at 182. Finally, although John McManus, defendants' accident reconstruction expert, testified to the low likelihood that the limited amount of force exerted in the collision would cause any physical injury (see id. at 199-201), he conceded that his conclusions were based on probabilities and statistics, and could not predict an outcome "in every instance . . . ." Id. at 207.

Accordingly, this Court concludes that the collision between the two vehicles caused

plaintiff's shoulder injury, as well as minor neck and back sprains.

III.     Damages

      A.     <u>Applicable Legal Standard</u>

Both sides acknowledge that Article 51 of New York's Insurance Law (the "no-fault statute") applies to this case and that all parties are "covered persons" as defined by the statute.[9]  <u>See</u> <u>generally</u> Pl. Mem.; Def. Mem.  Pursuant to the no-fault statute, a covered person is entitled to recover from the no-fault insurance carrier his "basic economic loss" on account of personal injury, regardless of fault.  <u>See</u> N.Y. Ins. Law §§ 5102(a), 5103(a).[10]  Basic economic loss is the first $50,000 of economic losses such as medical expenses and lost earnings.  <u>See</u> N.Y. Ins. Law § 5102(a).  Thus, a covered person who has sustained relatively minor injuries is able to recover his losses from no-fault insurance, without the need to file a tort action.  However, if the covered person has incurred more than $50,000 in losses, he or she may file an action against the persons responsible for the accident.  Importantly, "the injured party may not duplicate recovery of first party benefits but may recover in tort only that basic economic loss which exceeds $50,000."  <u>Patrello v. United States</u>, 757 F.Supp. 216,

-------------------

[9]  The statute includes as a covered person:

    . . . any owner, operator or occupant of, a motor vehicle which has in effect the financial security required by article six or eight of the vehicle and traffic law or which is referred to in subdivision two of section three hundred twenty-one of such law; or any other person entitled to first party benefits.

N.Y. Ins. Law § 5102(j).

[10]  These benefits paid by the insurance carrier are called "first-party benefits."  N.Y. Ins. Law § 5102(b).

219 (S.D.N.Y. 1991); see also N.Y. Ins. Law § 5104(a).

In cases where a covered person sustains a "serious injury," as defined by the no-fault statute, see N.Y. Ins. Law § 5102(d), the victim may bring an action in tort against another covered person to recover non-economic losses, such as pain and suffering, as well as economic losses in excess of $50,000. See N.Y. Ins. Law §§ 5102(c), 5104(a). Defendants do not dispute that a torn rotator cuff is a serious injury under the no-fault law. See Bennett v. Cruz, 562 N.Y.S.2d 638, 639 (1st Dep't 1990).[11] Thus, as this Court has found that the accident caused plaintiff's shoulder injury, plaintiff is entitled to recover non-economic losses, in addition to economic losses in excess of $50,000.

B.      Economic Loss Between the Date of the Accident and October 2003

Both plaintiff and plaintiff's doctor, Dr. Trovato, testified that, as a result of the accident, plaintiff was unable to continue his work as a butcher between the date of the accident and October 4, 2003. See Tr. at 37-38, 140, 142-43.[12] Plaintiff also introduced evidence, which was unchallenged by the defense, indicating that plaintiff earned $52,315.62 in the year preceding the accident. See id. at 17; Pl. Ex. 29. Thus, it is undisputed that

---

[11] The defense contends that plaintiff has not satisfied the "serious injury" threshold "in regard to the injuries claimed for his neck and back." Def. Mem. at 5; see id. at 1-2. However, where the plaintiff has established a serious injury – here, a torn rotator cuff – he may also recover for additional injuries that would not independently satisfy the serious injury threshold. See Prieston v. Massaro, 484 N.Y.S.2d 104, 105 (2d Dep't 1985) (where "the trier of fact determines that a serious injury has been sustained, plaintiff is entitled to recover for all injuries incurred as a result of the accident.").

[12] Defendants have not argued that plaintiff could have found other employment during that period. Plaintiff, a high school drop-out who performed manual labor his entire working life (see Tr. at 17), had his dominant arm in a sling for three to four months after he underwent surgery. See id. at 35-36; see also id. at 40.

plaintiff's lost wages between the accident on August 1, 2002 and October 4, 2003, the day his

doctor cleared him to return to work, totaled $61,034.89.  See Pl. Mem. at 13.  In addition, as

a result of the accident, plaintiff incurred medical expenses totaling $25,341.93.[13]  Therefore,

plaintiff's total economic loss up to the date when he was able to resume work as a butcher was

$86,376.82.  As set forth above, the first $50,000 of plaintiff's economic loss must be

deducted from his total economic loss, pursuant to New York's no-fault statute.[14]

Accordingly, plaintiff incurred recoverable losses in the amount of $36,376.82.[15]

     C.     Economic Loss Between October 2003 and the Date of Trial

     Plaintiff additionally claims that he is entitled to recover $42,745.30 in past lost

earnings for the time period beginning on October 4, 2003, the date Dr. Trovato gave him

medical clearance to return to work as a butcher, and the date of trial.  See Pl. Mem. at 17.

This amount represents the difference between his earnings while working at Food Emporium

---

[13]  Although plaintiff alleges that he incurred medical expenses in the amount of $34,335.58
(see Pl. Mem. at 13), the medical records he submitted into evidence reflect $25,341.93 worth
of expenses.  See Pl. Ex. 3, 5, 7, 9, 11, 13, 15, 17, 19, 21, 23, 25.  All of plaintiff's medical
expenses were paid by Allstate Insurance (see Tr. at 44) and predated his move to Florida in
October 2003.  See generally id. at 143, 177.

[14]  Plaintiff testified at trial that his medical expenses had been covered by Allstate Insurance,
his no-fault carrier.  See Tr. at 44.  He further testified that Allstate had paid him lost wages of
$800 to $1000, but he failed to specify how frequently those payments were made or over what
period of time.  See id. at 44-45.  As the no-fault insurance law prevents an accident victim
from recovering more than $50,000 of economic loss from his insurance carrier, plaintiff
concedes that $50,000 must be deducted from the amount of economic loss sustained by
plaintiff.  See Pl. Mem. at 14 & n.1.  No evidence was presented during trial indicating that
plaintiff received payment from another source.

[15]  In order to further the purpose of the no-fault statute, see generally Patrello v. United
States, 757 F.Supp. 216, 219 (S.D.N.Y. 1991), the $50,000 must be deducted from plaintiff's
economic loss award at the outset, before any reduction for comparative fault.

during the year preceding the accident ($52,315.62), and his current annual salary ($29,000) at Publix. See id. However, the evidence at trial does not establish that plaintiff's diminution in earnings resulted from his injury. During trial, plaintiff presented no documentary evidence concerning the termination of his position at Food Emporium. Instead, the only evidence on this issue was plaintiff's own, somewhat confusing, testimony that he told Dr. Trovato in October 2003, "[he] was going to relocate to Florida because [he] wasn't going to have a job for long, because [he] was fourteen months out of that job. They wasn't gonna hire [him] back." Tr. at 38.

On cross-examination, plaintiff acknowledged that his job at Food Emporium was a union job and was covered by a contract. See id. at 42. Neither the contract, nor notice of termination, was offered into evidence at trial. In response to a question from this Court, plaintiff stated that, although he did not remember when his fiancée had relocated to Florida, she did so before he moved in October 2003. See id. at 48. Plaintiff presented no evidence that he relocated to Florida because he had found a job there. Instead, plaintiff explained that he moved down to Florida in October 2003 and found a job once he arrived. See id. at 38.

Plaintiff has the burden of proving, by a preponderance of the evidence, that his damages, including lost wages, resulted from his injury. See generally Marrero-Agosto v. Amtrak, No. 96 Civ. 6453 AGS, 1998 WL 901720, at *4-5 (S.D.N.Y. 1998); Dennehy v. United States, No. 86 Civ. 9035 (LLS), 1988 WL 18935, at *4, 9 (S.D.N.Y. 1988) (citing DeMartino v. United States, 558 F.Supp. 1188, 1191 (E.D.N.Y. 1983)). Plaintiff has not met his burden with respect to his claim for lost wages between October 2003 and the date of trial. The evidence establishes that once his shoulder had reached maximum medical improvement,

plaintiff moved to Florida to live with his fiancée, and not because he had found a job in

Florida. Although plaintiff's non-union job[16] at Publix in Florida pays less than his earnings

(including overtime hours) at Food Emporium in New York City, plaintiff's reduction in

income after October 2003 is the consequence of his personal choice to move to Florida, not of

his shoulder injury. See Inzinna v. Brinker Rest. Corp., 754 N.Y.S.2d 495, 496 (4th Dep't

2003) (upholding jury verdict awarding no damages "[i]n view of the evidence that plaintiff's

lost wages are the result of factors unrelated to the accident . . . ."); see also Coyle v.

Intermagnetics Corp., 699 N.Y.S.2d 600, 601 (3d Dep't 1999) ("a reduced earnings award

may be denied where the reduction in earning capacity results from age, economic conditions

or other factors unrelated to the disability . . . .").[17] Accordingly, plaintiff is not entitled to

lost wages for this period.

  D. Future Lost Wages

  Plaintiff also seeks to recover future lost earnings – to wit, the difference between the

amount he will earn at Publix until he reaches retirement age in 20 years, and the amount he

would have earned had he kept his position at Food Emporium in New York City until

retirement age. See Pl. Mem. at 14. As discussed in the preceding section, plaintiff is not

entitled to recover any lost earnings resulting from his move to Florida. Accordingly, his

demand for future lost wages is denied.

---

[16] See Tr. at 42.

[17] Moreover, the numerical difference between plaintiff's earnings at Food Emporium and at
Publix is somewhat misleading. The Court takes judicial notice that the cost of living in New
York City is one of the highest in the nation. Cf. Bechtel v. N.Y.S. Banking Dep't, No. 92-
CV-182S, 1996 WL 125602, at *6 (W.D.N.Y. March 15, 1996).

E.    Pain and Suffering

1.    Past Pain and Suffering

"When determining the appropriate damages for pain and suffering, [a court] is bound by a standard of reasonableness." Mastrantuono v. United States, 163 F.Supp.2d 244, 258 (S.D.N.Y. 2001) (citing Battista v. United States, 889 F.Supp. 716, 727 (S.D.N.Y. 1995)).  In order to determine whether a consensus exists as to the value of a particular injury, a court sitting in diversity should consider "jury awards condoned by the courts of the state whose substantive law governs the rights of the parties," Martell v. Boardwalk Enters., Inc., 748 F.2d 740, 750 (2d Cir. 1984), along with a body of reported jury verdicts.  See generally Williams v. United States, 747 F.Supp. 967, 1014 & n.59 (S.D.N.Y. 1990); Pruitt v. Suffolk OB-GYN Group, P.C., 644 F.Supp. 593, 596 (E.D.N.Y. 1986) (McLaughlin, J.).

A review of New York caselaw and jury verdicts involving similar injuries reveals that courts and juries typically award between $100,000 and $200,000 for past pain and suffering involving torn rotator cuffs.[18]  To be sure, plaintiff has identified a few cases in which juries

_____

[18]  See Elescano v. Eighth-19th Co., 794 N.Y.S.2d 316 (1st Dep't 2005) (sustaining jury's award of $100,000 for past pain and suffering for a ruptured rotator cuff that required physical therapy three times a week for about a year, then surgery, followed by six more months of physical therapy, and then home exercise of 30 to 40 minutes a day continuing through the trial); Dagavarian v. City of New York, JVR No. 411829, 2002 WL 32509052 (LRP Jury) (New York County Nov. 2002) (awarding $148,675 for pain and suffering for a right patella fracture requiring surgery, arthritis and a torn left rotator cuff); Skinner v. Ventouras, JVR No. 413715, 2002 WL 32508431 (LRP Jury) (Kings County Feb. 2002) (plaintiff awarded $125,000 for pain and suffering for a torn left rotator cuff requiring surgery, and a left shoulder strain); Gordon v. Rivara, JVR No. 386899, 2001 WL 823237 (LRP Jury) (Kings County Jan. 2001) (jury awarded $200,000 for pain and suffering where plaintiff suffered a right rotator cuff tear with nerve impingement, requiring joint resection surgery); Czerlanis v. 12-28 150th Realty Corp, JVR No. 414022, 2001 WL 34553754 (LRP Jury) (Kings County

(continued...)

17

have awarded significantly more than this amount.  See Bernstein v. Red Apple Supermarkets, 642 N.Y.S.2d 303 (1ˢᵗ Dep't 1996) (court reduced jury award of $750,000 for past pain and suffering for serious injuries, including a torn rotator cuff, to $600,000); Guillory v. Nautilus Real Estate, Inc., 624 N.Y.S.2d 110 (1ˢᵗ Dep't 1995) (court sustained jury award of $450,000 for past pain and suffering for a very extensive rotator cuff tear that necessitated a complicated surgical procedure, 16 months of formal therapy, continuing home therapy, continuing pain and restriction of movement, and a continuing deterioration, with a prognosis of further degenerative changes).  On the other hand, this Court has uncovered numerous awards that fall significantly below the $100,000 to $200,000 range.  See Leonard v. Irwin, 721 N.Y.S.2d 198

---

[18](...continued)
June 2001) (jury awarded plaintiff $100,000 for pain and suffering for nerve damage requiring surgery and a rotator cuff tear in right arm and cervical strain); Hafner v. County of Onondaga, 723 N.Y.S.2d 574 (4ᵗʰ Dep't 2000) (court found that an award of $150,000 for plaintiff's past pain and suffering was the maximum amount the jury could reasonably have awarded for a torn rotator cuff where plaintiff was able to continue to work without corrective surgery and was able to control his pain with aspirin); Adamy v. South Buffalo Railway Co., 18 NY J.V.R.A. 5:5, 2000 WL 33714078 (Erie County Dec. 2000) ($100,000 award for past pain and suffering for partial tear of right dominant rotator cuff that required surgery, and aggravation of previously asymptomatic degenerative disc disease); Sheeler v. Blade Contracting Inc., JVR No. 368530, 1999 WL 1132684 (LRP Jury) (Kings County Jan. 1999) (plaintiff awarded $200,000 in total pain and suffering for a rotator cuff tear of the right shoulder requiring surgery), aff'd, 704 N.Y.S.2d 501 (2d Dep't 2000); Stanley v. City of New York, 14 NY J.V.R.A. 9:6, 1997 WL 33346751 (New York County Feb. 1997) (jury award of $100,000 for past pain and suffering for a glenoid fracture and rotator cuff tear to the dominant shoulder where plaintiff declined recommended surgery); Galeno v. Smith, 14 NY J.V.R.A. 10:14, 1997 WL 33346556 (Kings County May 1997) (jury rendered an award of $100,000 for past pain and suffering for a tear of the non-dominant rotator cuff with muscle impingement requiring arthroscopic surgery); May v. European Health Spas, Inc., 478 N.Y.S.2d 427 (4ᵗʰ Dep't 1984) (court reduced jury award of $300,000 to $200,000 for pain and suffering and permanent injuries for a rotator cuff tear in the left shoulder resulting in a claimed substantial loss of use); see also Brotas v. Wilfred Realty Co., JVR No. 385648, 2001 WL 468897 (LRP Jury) (Bronx County March 2001) (plaintiff awarded $250,000 for pain and suffering for a full tear of the left rotator cuff, requiring open reduction and a second surgery, as well as an internal fixation and herniated cervical discs); Bennett, 562 N.Y.S.2d 638 (total award of $215,000, not broken down into economic and non-economic damages, for a torn rotator cuff).

(4th Dep't 2001) (jury's award of $3,500 for past pain and suffering for a torn rotator cuff that caused severe pain and limited mobility and that required two invasive surgeries to repair was found by the court to deviate materially from what would be reasonable compensation – i.e., $50,000); Severin v. Benenati, 12 Nat. J.V.R.A. 7:19, 1997 WL 33345765 (Kings County March 1997) (jury awarded $25,000 for past pain and suffering for a rotator cuff tear requiring surgery involving the insertion of pins into the shoulder), aff'd, 673 N.Y.S.2d 1017 (2d Dep't 1998); Beckwith v. Rute, 653 N.Y.S.2d 172 (3d Dep't 1997) (jury awarded plaintiff $75,000 for torn rotator cuff requiring intensive physical therapy and two operations); Cibin v. O'Connell, JVR No. 205068, 1997 WL 635100 (LRP Jury) (Orange County June 1997) (jury awarded $50,000 for pain and suffering for a rotator cuff tear to the right shoulder requiring surgery, as well as herniated cervical and lumbar discs, aggravation of pre-existing osteoarthritis, and degenerative changes to the right shoulder); Morris v. Reliable Bus Charter Co., 14 NY J.V.R.A. 3:9, 1996 WL 33344003 (Queens County June 1996) (jury returned a verdict of $80,000, apparently for both economic and non-economic damages, for a rotator cuff tear requiring surgery, as well as other injuries); Yurkins v. Goei, JVR No. 193730, 1996 WL 857700 (LRP Jury) (Queens County Dec. 1996) (jury awarded $50,000 total pain and suffering for a herniated disc and bilateral torn rotator cuffs, resulting in surgery and tendinitis); Countermine v. Galka, 593 N.Y.S.2d 113, 116 (3d Dep't 1993) (court approved jury award of $15,000 for past pain and suffering for a torn rotator cuff that limited plaintiff's ability to move his arm without pain).

Here, it is undisputed that plaintiff suffered a large rotator cuff tear. See Tr. at 129, 182. In fact, the evidence shows that plaintiff not only tore his rotator cuff off the bone, but also tore the rotator cuff tendon. See id. at 132. After seven months of conservative care,

plaintiff underwent open surgery, for which he was given general anesthesia.  See id. at 34-35, 131-32.  During the surgery, plaintiff's rotator cuff was sewn back onto the bone and an acromioplasty was performed.[19]  As noted above, plaintiff's arm remained in a sling for three months, after which he underwent four months of physical therapy.

There is extensive testimony indicating that plaintiff experienced a substantial amount of pain from the evening of the accident until after the surgery.  See id. at 30, 31, 32, 118, 122-23, 124, 125, 127, 128, 129-30, 131, 136, 138.  As a result of his injuries, plaintiff had to give up his volunteer position as an auxiliary police officer.  See id. at 18.  Based on the foregoing evidence, this Court concludes that plaintiff is entitled to $175,000 for past pain and suffering.[20]

2.      Future Pain and Suffering

In his post-trial submission, plaintiff argues that he is entitled to $250,000 for future pain and suffering to compensate for his pain and "for the permanent effect of the injury."  Pl. Mem. at 16-17.  For the reasons set forth below, this Court denies plaintiff's request for future pain and suffering.

A review of the evidence presented at trial shows that plaintiff does not suffer from a permanent disability in his shoulder.  Although Dr. Trovato testified that, when he last examined him on October 4, 2003, plaintiff suffered a (permanent) ten percent loss of range of motion in his right shoulder (see Tr. at 143-44), and defendant's medical expert, Dr. Barry

---

[19]  Dr. Trovato explained that the acromioplasty involved shaving away the bone above the rotator cuff in order to alleviate the pain and to allow better healing of the rotator cuff.  See Tr. at 132.

[20]  As set forth supra note 8, any neck and back injuries sustained by plaintiff were minor and transient in nature; whatever pain plaintiff experienced as a result of those injuries is accounted for in the Court's award of $175,000 for past pain and suffering.

Katzman, similarly found a "mild" (i.e., five to ten percent) limitation in plaintiff's range of motion (see id. at 176, 178),[21] Dr. Katzman saw nothing that would prevent plaintiff from engaging in a normal range of daily activities, including manual labor "with essentially no restrictions." See id. at 177-78. Moreover, notwithstanding Dr. Trovato's opinion that plaintiff may experience weakness in his right shoulder when lifting heavy objects or conducting overhead activities (see id. at 144), plaintiff's own testimony is consistent with Dr. Katzman's opinion as to his ability to function without restriction. In response to questions about his current medical complaints, plaintiff did not mention any shoulder pain or shoulder restriction. See id. at 40-41. Notably, plaintiff is able to continue his work as a butcher without any limitation. He is not receiving any medical treatment, nor is any warranted. See id. at 177. Accordingly, this Court is not persuaded that plaintiff is entitled to any damages for future pain and suffering for his rotator cuff injury.[22]

Plaintiff did testify that he currently experiences occasional numbness in his right hand and that his neck locks once in a while when he is watching television. See Tr. at 39, 41. Even if the Court credited that testimony – and it does not – the medical evidence fails to establish that the collision in 2002 caused any permanent or lasting neck injury or nerve damage. To begin with, no medical records were submitted during trial indicating that plaintiff suffered from any neck problems after 2003. In fact, the medical records indicate that

---

[21] The record is silent as to plaintiff's range of motion before the accident.

[22] Plaintiff understandably does not seek damages for the scar resulting from his shoulder surgery, as the record contains no testimony or other evidence that the scar causes him any pain or suffering. See Hornicek v. Yonchik, 726 N.Y.S.2d 790, 792 (3d Dep't 2001) (sustaining jury's decision to award no damages for future pain and suffering to a plaintiff who suffered dog bites on his inner thigh and buttocks, with permanent scarring and itching; "not every scar will result, per se, in an award based on future suffering.").

plaintiff's cervical sprain was resolved sometime between October 12, 2002 and February 1, 2003. See Pl. Ex. 26. Although Dr. Katzman observed a ten degree loss of rotation to the left in plaintiff's neck, such a finding "is, for all intents and purposes, almost completely normal." Tr. at 179. In any event, no evidence links this finding to the accident in 2002.

Nor is there any evidence whatsoever as to the etiology of the numbness in plaintiff's right hand. Plaintiff presented no medical testimony explaining this condition. Under New York law, "[e]xpert medical opinion evidence is required when the subject-matter 'is presumed not to be within [the] common knowledge and experience' of the" finder of fact. Jimenez v. Supermarket Serv. Corp., No. 01 Civ. 3273(DLC), 2002 WL 662135, at *4 (S.D.N.Y. Apr. 22, 2002) (quoting Fane v. Zimmer, Inc., 927 F.2d 124, 131 (2d Cir. 1991)). Consequently, where, as here, "the medical effect on the human system of the infliction of injures is not generally within the sphere of the common knowledge of the lay person," the plaintiff must introduce medical evidence to establish the cause of his physical injuries. Jimenez, 2002 WL 662135, at *4 (quoting Barnes v. Anderson, 202 F.3d 150, 159 (2d Cir. 1999)). Inasmuch as plaintiff offered no medical evidence as to the cause of his alleged current symptoms -- i.e., the stiffness in his neck and numbness in his hand -- he has not proved that either condition was casually related to the August 2002 accident, as opposed to some other cause, such as years of working as a manual laborer.

## CONCLUSION

For the reasons set forth above, this Court concludes that defendants are 75 percent at fault for the accident and that plaintiff is 25 percent at fault. Beyond his basic economic loss (which was covered by no-fault insurance), plaintiff suffered $36,376.82 in lost wages and $175,000 for past pain and suffering, for a total of $211,376.82. This amount must be

reduced by 25 percent to account for plaintiff's comparative negligence. Accordingly, plaintiff is entitled to recover $158,532.62 from defendants.

The Clerk is directed to enter this Memorandum and Order into the ECF system and to enter judgment consistent with this opinion.

SO ORDERED.

Dated:      Brooklyn, New York
August 19, 2005

/s/
ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE